UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

--------------------------------------------------------

JAMES DAVIS,

       Plaintiff,                             Case No. 3:12-CV-01102-JBA

vs.

HUNT LEIBERT JACSOBSON, PC and
WELLS FARGO BANK, NA.,

       Defendants                         January 17, 2013

--------------------------------------------------------

## OPPOSITION TO JOINT MOTIONS TO DISMISS

Plaintiff, JAMES DAVIS, responds and opposes the Motion to Dismiss of Defendant Hunt Leibert Jacobson, PC ("HL") dated December 18, 2013 and the Motion to Dismiss of Defendant Wells Fargo Bank ("WF") dated December 27, 2013 as set forth herein.  In as much as the basis for both motions are essentially identical, Plaintiff will address both motions in a single opposition, with distinctions set forth as appropriate.

## PROCEDURAL HISTORY

Plaintiff filed his complaint for violation of various statutes and common law theories for violations that occurred in the prosecution of a state foreclosure action against the Plaintiff.  In the State Action, Defendant HL was attorney for (and therefore agent of) Defendant WF the bank seeking foreclosure.   Plaintiff amended its Complaint on December 6, 2012.  The operative complaint alleges six (6) causes of action: 1) Violation of the Servicemembers Civil Relief Act 50 App. U.S.C. §§501, et seq., 2) Connecticut Unfair Trade Practices Act, C.G.S. §§36A-110 et

seq.  3) Violation of Connecticut Consumer Banking Law C.G.S. §36A-645, et seq., ; 4)

Violation of the Fair Debt Collection Practices Act 15 U.S.C. §1692d (as against Defendant HL

only); 5) Common law negligent infliction of emotional distress; and 6) Breach of Obligation of

good faith and fair dealing.  Defendant HL filed its motion to dismiss on December 18, 2012.

Defendant WF filed its motion to dismiss on December 27, 2012 essentially adopting the

arguments of Defendant HL.

## FACTUAL HISTORY

Plaintiff owns a single family house in Plainfield, Connecticut.  Plaintiff is a sailor in the

U.S. Navy and at, all relevant times, was serving aboard a nuclear-powered submarine.   In 2006

Plaintiff borrowed money secured by the house in the form of a note and mortgage.  In March

2009 Defendant WF (the bank)  retained Defendant HL (the law firm) to commence a foreclosure

against Plaintiff.  Said action was commenced in Connecticut Superior Court (the "Foreclosure

Action").  The Foreclosure Action was resolved through the Court mediation process in August

2009 on the eve of active duty foreign deployment of the Plaintiff. Said foreign duty deployment

involved being stationed on a nuclear-powered submarine of the United States Navy, at sea for

months at a time with largely no personal contact with the outside world. After being deployed,

Plaintiff caused the agreed payments to be made to Defendant WF.  Some time during his

deployment, the bank repudiated the agreement.   The Foreclosure Action was then dismissed by

the Superior Court in or about May 10, 2010.   In June 2010 WF re-opened the dismissal by

default, obtained a judgment of strict foreclosure by default and obtained a law day of September

16, 2010.  Some time prior to the law day, while Plaintiff was still overseas on deployment,

Defendants contacted the family of Plaintiff and demanded that they vacate their family home in

the face of the judgment and impending ejectment.  In August 2010, in response to this demand the family (including 5 minor children) relocated out of state.  After the Plaintiff's family left, prior to the law day, Defendant WF exercised all dominion and control over the house[1].  Defendant WF never filed their certificate of foreclosure after the September 16, 2010 law day which would have given them title to the house and real property.   In November Defendant again sought to re-open their own judgment due to internal servicing issues.   In January 2011 the foreclosure was again dismissed.  Between August 2010 and January 2011 the home was damaged and vandalized to render it uninhabitable.  Plaintiff learned of this circumstance, but remains without any offer of help or assistance by the Defendants who place him in this position of continuing to own the damaged home with the mortgage still unpaid, continuing expenses of family housing outside the state and other expenses, both economic and psychological.

## THE MOTIONS TO DISMISS[2]

### Servicemembers Civil Relief Act

**Purpose of the Act. "The purpose of the Relief Act is to suspend enforcement of civil liabilities of persons in the military service fo the United States in order to enable such persons to devote their entire energy to the defense needs of the nation."** *Savarese v United Sates Hud,* 2005 U.S. Dist. LEXIS 2281, 11-12 (S.D.N.Y. February 15, 2005) as cited by Defendant HL in its Memorandum Dated 12/18/2012 (hereafter HL Memo) at page 6.   This case is a poster child for supporting the purpose and intent of the SCRA.  Plaintiff, knowing he was

---

[1]WF's lock is still on the premises preventing entry.

[2]It is clear the Cause of Action for violation of the FDCPA does not apply to Defendant WF and Plaintiff has not asserted such claim.

being deployed to a forward combat area, resolved his collection and foreclosure case with the bank.  The foreclosure case was dismissed.  After dismissal, (and Plaintiff's deployment on a nuclear submarine)  Defendants, nevertheless, unilaterally breached their agreement, and proceeded to a default judgment.[3] Said action forced Plaintiff's family to abandon their family home, which in consequence lead to vandalism and destruction of their family home. The entire purpose of the Act is thwarted and circumvented by the Defendants' actions. Can the Court envision the thoughts going through Plaintiff's mind as he is serving on the front lines in harms way when he first learns of default judgment and his family being forced to leave their home and relocate?   When the Defendants are done toying with him and his family, they leave them the crumbs of their efforts and now seek to tell this Court (and our nation) that this is proper and the "purpose of the act is not violated" by their actions?   I think not.

### The Violation

Both Defendants contend that there is no specific provision of the SCRA that is violated by their actions, even if every tawdry detail is admitted.  Too bad we lied to you, it is not a "technical violation."  Defendants admit that , 50 App.  U.S.C . §521 applies to default judgments.

The First Amended Complaint of the Plaintiff properly allege that a default judgment was entered without notice to the Plaintiff.   It is clear that under Connecticut law (Practice Book § 17-43 ) judgments may be opened for a four (4) month period after entry for good cause.   WF and HL indicate that the SCRA does not apply after "appearance" of the service member.

_____

[3]The facts are further supported by Exhibit 1 of the HL Memo, which is the docket printout of the state foreclosure case.

Nonetheless, the SCRA does not make a distinction between appearing by merely filing an appearance form and actually answering the complaint and participating in the litigation. Furthermore, it is probable that the drafters of the SCRA did not take the unique rules of Connecticut for re-opening a judgment into account.  Additionally, had Plaintiff been represented by counsel in February 2010, in connection with his settlement, competent counsel would have known to request a withdrawal of the action which would have resolved the issue with finality, thereby properly protecting Plaintiff from this anomaly and subsequent default actions.  Although the judgment was, again, later vacated, the entry of the judgment by default without notice and the false statements made by Defendants, jointly and severally, let to Plaintiff losing his household home, causing extreme distress and financial harm to Plaintiff.

The claim in the motions to dismiss is that after "appearance" the SCRA does not apply. In short, however, the SCRA provides that a default cannot be entered against a service member without ensuring that adequate notice is given to the servicemember.  The purpose of this requirement is to make sure that the procedural due process protections of the 5th and 14th Amendment to the United States Constitution is met. Defendants would, instead, have this Court ignore the purpose of the SCRA to ensure such procedural due process and, instead, allow the Defendants to trample on the Plaintiff's constitutionally protected rights.   In this case the Defendants rely on the sole fact that Plaintiff had appeared in the case *pro se* and attempted to resolve the matter.  However, they nonetheless avoid the fact that after a purported resolution and *dismissal* of the case, the Defendants proceeded to have serial orders and judgments entered against the Plaintiff, knowing that he would be unable to be notified or respond as a result of his active duty status.  The Court is urged to take note of the aggressive time table forced by the

Defendants.  The mediation final report reporting the settlement is February 8, 2010.  The Plaintiff is then deployed to a forward combat area with the impression that he has resolved this issue and his family would be protected from the foreclosure during his unavailability.  The Defendants know this.  The case is then dismissed on the Court's own motion on June 7, 2010. Defendants respond by filing first their motion for summary judgment on June 17, 2010, a motion to open judgment of dismissal on June 18, 2010, a motion for judgment of strict foreclosure on July 13, 2010 and finally entry of judgment July 26, 2010. **All entries were made by default, all within six (6) short weeks, and all without proper and meaningful notice, due to the inability of Plaintiff to respond due to his deployment and unavailability.**[4]  This violation meets the very spirit and letter of the SCRA default provisions.

SCRA was recently amended to expand this Court's ability to evaluate and act upon violations of the SCRA.  Previously, such remedies were limited.  They were expanded to include a private right of action, criminal penalties and broad legal and equitable remedies for the Court.  50 app U.S.C. §597a.  Congress (and the American people) are sending a message to the banks, lawyers and debt collectors, that violation of the SCRA is serious and will be dealt with.

### Notice of the Proceedings - Automatic Stay

WF goes on to suggest that it cannot have violated the stay provisions of Section 522 of SCRA as the provisions of Section 522 "places the burden solely on the servicemember who has notice of the proceedings" to apply to the Court for the applicable stay. As noted, *supra*, the Plaintiff herein did NOT have proper notice of the proceedings as he was deployed and

---

[4]Evidence will be presented at trial that Plaintiff's wife attempted to address the Court but was silenced by both Defendants due to some "apparent lack of authority."

underwater on a tour of duty on a nuclear submarine and the Plaintiff was therefore unable to receive the requisite notice.

Nonetheless, despite the Plaintiff's inability to receive notice, the Plaintiff's family attempted to set forth facts stating the Plaintiff's unavailability and deployment status, which were rebuffed by the Defendants. While WF correctly cites the relevant provisions of the SCRA affecting the application for a stay, the Defendants gloss over the efforts undertaken by the Plaintiff's family in that regard. While Section 522 requires an application by the servicemember for the stay, the relevant provisions make no accommodation or requirement for the form of such an application. In the instant case, the Plaintiff's wife, who is not named as a party, contacted the Defendants and advised them that her husband was deployed and unable to attend to the pending action. The Defendant responded only by saying that because the Plaintiff's wife was not a party to the action, and not specifically a servicemember under the relevant statute, that her application for stay would be ignored. The Defendants, of course, neglect to recognize that it would have been IMPOSSIBLE for the Plaintiff to make such an application personally, and instead chose to ignore the obvious circumstances so that they could proceed to foreclosure more quickly.

Pursuant to the Connecticut Rules of Professional Conduct, attorneys have an obligation of candor towards the tribunal, Rule 3.3, and to act fairly towards opposing parties, Rule 3.4. That same obligation is likewise imputed to the represented parties of attorneys. Here, the Defendants obtained information about the Plaintiff's unavailability from the Plaintiff's own wife, chose to ignore it, and instead proceeded to default the Plaintiff without informing the Court of the circumstances. Such behavior cannot be condoned by the Court.

## FDCPA

### Lack of Basis for FDCPA Liability

HL contends that there is no basis for FDCPA stating . . . "[T]he entire action is premised upon Hunt Leibert filing a foreclosure action in State Court." (HL Memo, p.9).  A clear reading of the First Amended Complaint shows that the actions complained of by Plaintiff are not the mere filing of the foreclosure, but the actions of the attorneys as debt collectors and their clear violation of the statute by (1) violating the SCRA and (2) by giving the Plaintiff and his family false information and misdirection causing them to abandon their home and relocate their family under duress. Said actions further lead to the consequence of the affected home being physically vandalized and destroyed as a direct result of the abandonment.   At no time did HL properly advise Plaintiff's family[5] (left behind after his deployment) that they (Defendants) had an obligation to obtain an ejectment order after the law day passed and WF was in title and that they would have an opportunity to contest or limit the terms of such ejectment.  Instead the Defendants told the family of the Plaintiff simply that they had to leave by a date certain or they would be physically thrown out of their house.  The abusive practice is nothing but lying and deceitful practice with an improper and unethical advantage taken by HL of the family of an absent pro se party.  Clearly this is a practice to be remedied by the very spirit and intent of the FDCPA.

### Is HL a Debt Collector in Foreclosure Actions

Defendant contends that in "mortgage foreclosure cases" it is not a "debt collector"

---

[5]Their ethical obligations herein are clear with respect to dealing with a pro se party; the Defendant is required to not take advantage of any superior legal knowledge or lack thereof of one's pro se opponent.

within the meaning of the FDCPA.   Defendant relies heavily on the recent district court case of *Derisme v. Hunt Liebert Jacobson, PC* et al, 2012 US Dist. LEXIS 101923.  The basis for this reliance is that HL is only seeking to enforce the security interest of the mortgage.  In *Derisme,* supra, Judge Bryant points out that this is a case of first impression in the Second Circuit and the issue remains subject to further review.  The remaining Circuits are split.[6] The Second Circuit's holding in *Romea v. Heiberger & Assocs.,* 163 F.3d 111 (2d Cir. 1998)[7] would seem to command a different result. In *Romea,* the Second Circuit held that a defendant law firm's letter to the plaintiff-tenant prior to the initiation of a possessory in rem action to recover the client landlord's premises constituted a communication protected by the FDCPA. Id. at 116. The Second Circuit rejected the defendant's contention that the collection letter was not subject to FDCPA protection because it was a "statutory condition precedent" to commencing summary eviction (a non-legal action?). Id. The *Romea* court held that because the letter "conveyed information *regarding a debt [emphasis added]*" to another person, it was a "communication" as defined by the FDCPA. Id. Because defendant "ma[de] no attempt to deny that its aim in sending the letter was at least in part to induce [Plaintiff] to pay the back rent she allegedly owed," the court ultimately concluded that the delivery of the letter constituted debt collection activity.   *Romea,*  was followed later  by *Goldman v. Cohen*, 445 F.3d 152 (2d Cir. N.Y. 2006) in which the FDCPA was held to be applicable to eviction and rent collection cases.  It is hard to distinguish between trying to collect rent and thereafter evicting a party for non-payment of said rent when compared to trying to

---

[6]See Vozza, *The FDCPA Application in the Foreclosure Process,* 24 Loyola Consumer Law Review 640 for a discussion of various circuit positions.

[7]Rejected by *Derisme*, but arguable still controlling on the issue of whether anything less than a legal action is a debt collection under FDCPA.

collect a mortgage by foreclosing on the debt owed.  This Court should not be swayed by the lack of logic in *Derisme*.

*Derisme* further discusses the fact that since an action for a claim of relief for a deficiency judgment seeks money damages,  it is tantamount to an action seeking to collect a debt.  Citing to *Eichman v. J. & J. Bldg. Co., Inc.*, 216 Conn. 443, 453, 582 A.2d 182 (1990) ("Indeed, deficiency judgment hearings more closely resemble suits for collection than condemnation hearings.").  The *Eichman* court rejected this argument due to the fact that, similar to this case, the foreclosure ended prior to the existence of any deficiency.   If one admits therefore that it is potentially acting to collect a "debt" by way of a deficiency action, the FDCPA should be operative with respect to any such action.  To do otherwise would implicitly condone activities fraught with fraud, harassment and other violations of the FDCPA, provided such activities do not result in "direct collection" of the debt.  There would therefore be no inhibition to violate the law, provided it resulted in a payment or settlement, which, of course, is the point of the offender's conduct in the first place.

Furthermore, this distinction is also not true on several counts.  First, in connection with its complaint (and every pleading and notice in every foreclosure case) HL gives the standard FDCPA warning as required (Exhibit A - Complaint in the State Foreclosure Case).  HL itself, in those warnings, *admits* it is a debt collector.  Likewise, if one were to telephone the office of HL, the first thing one hears, before speaking to a live operator, is a recorded message saying "this office is a debt collector." Furthermore, as argued *supra*, the foreclosure complaint requests a deficiency (money) judgment against the foreclosing defendant.  Clearly an effort to collect more than just the security interest, but to make the foreclosing bank whole by taking not only the real

property and seeking a money judgment for the difference constitutes debt collection within the meaning of the FDCPA.   HL argues (HL Memo p.11) that dismissal of the foreclosure action by the Court and the failure to subsequently file a superceding action somehow magically erases its prior bad behavior and status as a debt collector.  Modern cases in Connecticut State Court have not followed this aberrant result. *Deutsche Bank v. Lichtenfels*, 2009 Conn. Super. LEXIS 1732 (Conn. Super. CT. June 17, 2009) (Copy Attached as Exhibit B).

Indeed, the Second Circuit Court of Appeals has, itself, not been swayed by the *Derisme* ruling. In *Gabriele* v. *Law Offices of Martha Croog, LLC*, the Second Circuit declined to extend *Derisme*, instead indicating that "statements made and actions taken in furtherance of a legal action are not, in and of themselves, exempt from liability under the FDCPA." *Gabriele* v. *Am. Home Mortg. Servicing, Inc.*, 12-985-CV, 2012 WL 5908601 (2d Cir. Nov. 27, 2012). (Citing *Goldman* v. *Cohen*, 445 F.3d 152, 157, (2d Cir. 2006)). In *Gabriele*, while holding that the actions of the Defendant therein did not rise to an actionable level, the Court nonetheless indicated that if a law firm, working for a client attempting to collect a debt, could be liable under the FDCPA, if said law firm acts in such a way as to materially mislead or misrepresent the nature or legal status of the debt due and owing. Id.

The *Derisme* Court concludes that "[U]nder Connecticut law, mortgagors in a foreclosure proceeding likewise do not need protection from abusive collection methods that are covered under the FDCPA because the state foreclosure process is highly regulated and court controlled. In this case the process, and the court, failed the borrower, and the borrower should be entitled to recover for his injuries as a result. (But see Sections below for other state court remedies.)

### Are the False Statements Privileged?

Defendant also relies heavily on the unreported case of *Pellechia v. Onewest Bank FSB, etc. et al,* USDC Connecticut, 3:11-cv-1587 (JCH) for its assertion that the statements made by the Defendant are somehow privileged (Exhibit 2 to the HL Memo). *Pellechia* rejects this contention, however, indicating that while pleadings themselves might be subject to the privilege and thus immune from FDCPA, false and misleading statements are not. (HL Memo, Ex. 1 at p. 13). *Pellichia* does not, furthermore, address the use of statutory violations as a basis for a violation of the FDCPA.

The Court is convinced that the FDCPA implicitly abrogates common law litigation immunity, and this court declines to interpret the FDCPA in a manner that would "thwart the obvious purpose of the statute" *Romea v. Heiberger Assocs.*, 163 F3d 111,118 (2nd Cir. 1998) - *Pellechia* at page 16.

Thus in the face of violations of FDCPA and other consumer statutes as a basis for CUTPA, there is no litigation privilege as indicated by the Defendant.

### FDCPA Statute of Limitations

Plaintiff agrees the applicable statute of limitations is one year for a violation of FDCPA. Courts have held that "[e]quitable tolling applies to FDCPA claims in appropriate circumstances." *Coble v. Cohen & Slamowitz, LLP,* 824 F. Supp. 2d 568, 2011 WL 5142577, at p.3 (S.D.N.Y. 2011). "The doctrine of equitable tolling applies only in 'rare and exceptional circumstances' to allow a complainant to file a claim outside the applicable limitations period." *Boyd v. J.E. Robert Co.,* No.05-cv-2455(KAM)(RER), 2011 U.S. Dist. LEXIS 10099, 2011 WL 477547, at p.7 (E.D.N.Y. Feb. 2, 2011) (quoting *Bertin v. United States*, 478 F.3d 489, 494 n.3

(2d Cir. 2007)). "Generally, the doctrine applies only where, 'because of some action on the [D]efendant's part, the complainant was unaware that the cause of action existed.'" Id. (quoting *Long v. Frank,* 22 F.3d 54, 58 (2d Cir. 1994)). "In the context of a claim of fraudulent concealment, [P]laintiffs must show: (1) concealment of the alleged wrongdoing; and (2) [P]laintiffs failure to discover the facts giving rise to their claims despite their exercise of due diligence." Id. (citations omitted). Concealment may be demonstrated "by showing either that the [D]efendant took affirmative steps to prevent the [P]laintiffs' discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). "Even 'absent fraudulent concealment,' however, equitable tolling may apply in the presence of specific 'special circumstances' where 'a reasonable [P]laintiff in the circumstances would have been [un]aware of the existence of a cause of action.'" *Boyd,* 2011 U.S. Dist. LEXIS 10099, 2011 WL 477547 at p.7 (quoting *Veltri v. Building Serv. 32b-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004)). "Yet, while a [P]laintiff need not show fraudulent concealment in the presence of certain 'special circumstances,' such a [P]laintiff must still demonstrate due diligence in order to invoke the equitable tolling doctrine." Id.   In this case we have allegations of both concealment on the part of the Defendant as well as special circumstances regarding the Plaintiff's lack of awareness of the relevant cause of action. Nevertheless, the violations of the Defendant and their intended consequences continue to this date.  As a direct and proximate result of the violations, WF remains in control of the subject real estate with their padlock on the front door of the residence.  No insurance proceeds can be drawn without the written direction and consent of WF.  No corrective effort has been made by either HL or WF to advise the state court of their improper actions or to correct the state court record.

To now hold that the statute of limitation is not tolled as a result would be anathema to the goals of the FDCPA.

### No Violation Due to No Prevention of Payment of Debt

The Fourth Count of the First Amended Complaint incorporates by reference allegations of the First, Second and Third Causes of action sounding in violations of (1) the SCRA, (2) the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a et seq., and (3) the Connecticut Consumer Protection Statutes, Conn. Gen. Stat. § 36a-646, et seq. The Defendants attempt to suggest that, somehow, despite all of these allegations, the Plaintiff has not alleged that a representation or statement impeding the Plaintiff's ability to pay has occurred. Nothing can be further from the truth. The Complaint clearly alleges that the Defendants misled the Plaintiff by agreeing to a modification agreement, which the Plaintiff began to pay under, which was then reneged upon by the Defendants. The Plaintiff then alleges that the Defendants contacted family of the Plaintiff, knowing that Plaintiff was serving our country on a nuclear submarine and would otherwise be unable to receive any communications from the Defendants, and demanded that they vacate their family home or face forceful ejection. Such a demand came on the heels of a repudiated modification agreement, an improperly noticed default, and an improperly obtained strict foreclosure.

Theses statements and actions by the Defendants caused the Plaintiff's family to seek alternative housing, move three states away and pay rent on a house they could barely afford, thus denying the Plaintiff the opportunity to pay the debt incurred. Finally, after realizing the impropriety of the foreclosure, the Defendants allowed the property in question to be vandalized and damaged, and prevented the Plaintiff's family from moving back into their home due the

placement of a padlock on the front door of the house, requiring there to be additional rent payments made by the Plaintiff and further impeding the Plaintiff's ability to pay the incurred debt.

The Defendants go on to assert that the statements made by the Defendants were not "material as to mislead the Plaintiff." Again, such an assertion here borders on the ridiculous. To suggest somehow that the Defendants' statements were immaterial when they (1) caused the Plaintiff's family to vacate their home and (2) move to a different state and (3) deny them the opportunity to either contest the foreclosure or the debt owed (as they had already done previously) is unquestionably material, in that the statements accomplished the goals for which such statements were intended. The Plaintiff has alleged that the Defendants made statements or undertook actions intended to force or coerce the Plaintiff and his family into vacating the property, which had an effect of preventing or otherwise impeding the Plaintiff's ability to pay or otherwise challenge the debt at issue.

## CUTPA Claims Are Not Barred by Absolute Immunity

The Connecticut Unfair Trade Practices Act (CUTPA), can apply to the entrepreneurial aspects of the practice of law, that is, actions a law firm takes outside the filing of pleadings and other in-court activities. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79, 7171 A.2d 724 (1998). Likewise, a defendant law firm, one sued along with the creditor, can be deemed to be a debt collector under the FDCPA, provided said law firm made representations or statements intended to impede the Plaintiff's ability to pay or to challenge the debt owed. *See Easterling v. Collecto, Inc., 692 F.3d 229, 235 (2d Cir. 2012); Romea v. Heiberger & Assocs.,* 163 F.3d 111 (2d Cir. 1998); *Bentley* v. *Great Lakes Collection Bureau*, 6

F.3d 60, 62 (2d Cor. 1993). Correspondingly, a CUTPA claim based on violations of the FDCPA

will lie over an absolute immunity challenge.

> However, to the extent that Pellechia's CUTPA claims are based not upon the defendant's statements during the Foreclosure Action, but instead on violation of the FDCPA itself, the litigation privilege might not apply. See Desrisme v. Hunt Leibert Jacobson P.C. No. 3:10-CV-23, 2012 WL agreement, *27 (D. Conn. July 23, 2012. *Pellechia* at Page 18

It is axiomatic, therefore, that out-of-court statements and actions by a law firm intended to

impede the ability to pay or challenge the debt owed, in violation of the FDCPA can also violate

CUTPA, provided they do not take place in a courtroom setting, nor do they consist of the mere

filing of pleadings and such violation offends public policy or could otherwise be considered

immoral, unethical, oppressive or unscrupulous. Given the nature of debt collection practices by

law firms found violative of the federal act, it certainly can be shown in the appropriate case that

a CUTPA violation has occurred under the law firm's own power, and outside the limitations

ascribed by the Court in *Beverly Hills Concepts, Inc.*

Additionally, WF goes so far as to contend that there can be no CUTPA violation for

statements made out of court that are made in respect to a foreclosure action because such

activities are merely "incidental to an entity's primary trade or commerce." *McCann Real*

*Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 523, 890

A.2d 140 (2006). With respect to WF, the entity is a bank, engaged in accepting deposits and

channeling same into lending activities. Furthermore, WF, in pursuit of those same lending

activities, enters into security agreements with other parties, which must be enforced from time

to time, in order for the bank to continue to function. Likewise, with respect to HL, the entity is a

law firm, engaged in representing the interest of its clients both in and out of court. To say that a

bank taking property pursuant to a security agreement it entered on a loan it originated, or that a law firm engaging in zealous advocacy for its clients is not part of their "primary trade or commerce" would be "to twist the plain meaning of the words to create uncertainty in the language," and cannot be allowed here. *Rivers* v. *City of New Britain*, 288 Conn. 1, 10-11, 950 A.2d 1247 (2008).

Lastly, WF appears to suggest that it had no obligation to maintain the property in question, even after obtaining a judgment of strict foreclosure. Such a contention is, again, a twisting of the facts at issue. While WF correctly points out that, during the term of the mortgage, WF was under no obligation to maintain the property, though it had the opportunity to do so, so long as it was done to protect the interests of WF in the subject property. Ostensibly, this contractual provision is intended to keep responsibility for maintaining the property on the homeowner. WF neglects to consider, however, that upon the entry of a judgment of foreclosure, and the passing of the law day, the Plaintiff homeowner could reasonably expect that it was *no longer* the homeowner, and the property rights thereto became vested in WF. If WF was the owner of the property, as they became after the foreclosure, it would be unquestioned that they would be responsible for the maintenance and upkeep of same. Simply because WF made a mistake in foreclosing on the property in violation of the SCRA, does not excuse that same responsibility. WF cannot equitably, as they assert here, take ownership of a house, let it crumble to the point of uninhabitability, and then simply return it to the previous homeowner like nothing happened. Such behavior is exactly the type of behavior that would be considered unscrupulous and of the type that CUTPA is intended to punish.

**CCPA**

The Defendants claim that they have not violated any consumer banking laws.  The test is whether the pleadings, as taken as true, allege a violation.  Defendants are correct in that the Connecticut Consumer Protections Act, Conn. Gen. Stat. § 36a-646 (CCPA) provides that "No creditor shall use any abusive, harassing, fraudulent, deceptive or misleading device or practice to collect or attempt to collect a debt."  Certainly a clear reading of the Complaint alleges such a scheme of entering into a forbearance agreement, unilaterally repudiating it, waiting for Plaintiff to be absent, allowing dismissal of the case, re-opening the case without notice,  proceeding to default, threatening Plaintiff's family to vacate their home, not filing the certificate of foreclosure after taking possession and control of the property, allowing the ensuing damage to the house and forbidding to the Plaintiff and his family from returning to the property to be just such a practice as described in and prohibited by the CCPA.  A jury certainly could conclude the appropriate violation as alleged.

**Intentional Infliction of Emotional Distress**

The Defendants next claim that the Plaintiff cannot recover for intentional infliction of emotional distress, as the Plaintiff's claim is fundamentally one of breach of contract. Such an argument is inapposite here. While the Defendants are correct that a portion of the Complaint addresses a breach of contract, the Plaintiff herein has alleged the existence of a tort above and beyond the scope of a mere contractual breach. In order to state a claim for intentional infliction of emotional distress, the Plaintiff must allege (1) that the Defendants knew or should have known that emotional distress was a likely result of his conduct, (2) that the conduct was extreme and outrageous, (3) that the Defendants' conduct was the cause of the Plaintiff's distress and (4)

that the emotional distress sustained by the Plaintiff was severe in nature. *Delaurentis* v. *New Haven*, 220 Conn. 225, 266-67, 597 A.2d 807 (1991). All of these allegations have been specifically pleaded by the Plaintiff in the Complaint. Additionally, here, the Plaintiff has alleged that the conduct of the Defendants, specifically the actions undertaken by the Defendants of threatening Plaintiff's family to vacate their home, not filing the certificate of foreclosure after taking possession and control of the property, allowing the ensuing damage to the house and forbidding to the Plaintiff and his family from returning to the property are of such a nature as to satisfy the requirements of Delaurentis. Said actions are entirely without the bounds of a mere breach of contract, alleging an entirely separate cause of action and, as such, Defendants' argument fails.

**Breach of Covenant of Good Faith and Fair Dealing**

The Defendants likewise claim that Plaintiff has failed to state a valid claim for breach of the covenant of good faith and fair dealing. As before, the Defendants' argument must fail. In order to properly allege a cause of action for breach of the covenant of good faith and fair dealing the Plaintiff must allege (1) the [P]laintiff and the [D]efendants were parties to a contract under which the [P]laintiff reasonably expected to receive certain benefits, (2) that the [D]efendants engaged in conduct that injured the [P]laintiff's right to receive some or all of those benefits and (3) that when committing the acts by which it injured the [P]laintiff's right to receive some or all of those benefits he reasonably expected to receive under the contract, the [D]efendants were acting in bad faith. *Franco* v. *Yale University*, 238 F. Supp. 2d 449, 454-55 (D.Conn. 2002). All of these allegations have, again, been pleaded by the Plaintiff in the Complaint.

While the Defendants attempt to couch its argument on the theory that Connecticut does

not recognize a breach of the covenant of good faith and fair dealing as a special defense in mortgage foreclosure actions, the Defendants, again, misapprehend the facts as pleaded. The agreement at issue here, and upon which the Plaintiff alleges the Defendants breach the covenant of good faith and fair dealing, is the forbearance agreement and modification entered into between the Plaintiff and the Defendants. The Defendants agreed not to foreclose on the subject property provided that payments were made in accordance with the modification, and said agreement was made outside the bounds of the original loan documents and foreclosure action. It is the actions undertaken by the Defendants under the modification and forbearance, namely the actions undertaken by the Defendant of threatening Plaintiff's family to vacate their home, not filing the certificate of foreclosure after taking possession and control of the property, allowing the ensuing damage to the house and forbidding to the Plaintiff and his family from returning to the property which are violative of the covenant of good faith and fair dealing, not the original loan documents themselves. As such, Defendants' argument fails.

## Lack of Jurisdiction of State Claims if Federal Claims are Dismissed

As Plaintiff has indicated in the First Amended Complaint (¶2) , in the event that this Court determines that jurisdiction is lacking under 28 U.S.C. §1331 (federal question), this Court still has diversity jurisdiction under 28 U.S.C. §1332  based upon the diversity of the location of the parties and the amount in controversy exceeding $75,000.   Plaintiff is a resident of Maine. HL is a Connecticut entity with a principal place of business in Connecticut.  WF is a bank, doing business in Connecticut and headquartered in North Carolina.  Cases cited by Defendants are those in which separate diversity jurisdiction does not exist and should be appropriately distinguished in this case.

## CONCLUSION

The following is a footnote (Footnote 3) in an omnibus opinion, by USDJ Christopher A. Boyko, *In Re Foreclosure Cases*, No. 1:07CV2282, etc, ND Ohio, 10/31/2007, dismissing 14 foreclosure cases based upon improper standing which highlights the audacity of the banks in foreclosure cases today.

> 3. Plaintiffs, "Judge, you just don't understand how things work," argument reveals a condescending mindset and quasi-monopolistic system where financial institutions have traditionally controlled, and still control, the foreclosure process. Typically, the homeowner who finds himself/herself in financial straits, fails to make the required mortgage payments and faces a foreclosure suit, is not interested in testing state or federal jurisdictional requirements, either pro se or through counsel. Their focus is either, "how do I save my home," or "if I have to give it up, I'll simply leave and find somewhere else to live."
>
> In the meantime, the financial institutions or successors/assignees rush to foreclose, obtain a default judgment and then sit on the deed, avoiding responsibility for maintaining the property while reaping the financial benefits of interest running on a judgment. The financial institutions know the law charges the one with title (still the homeowner) with maintaining the property.
>
> There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative. There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary , they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through. Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate.
>
> The Court will illustrate in simple terms its decision: "Fluidity of the market" — "X" dollars, "contractual arrangements between institutions and counsel" — "X" dollars, "purchasing mortgages in bulk and securitizing" — "X" dollars, "rush to file, slow to

record after judgment" — "X" dollars, "the jurisdictional integrity of United States District Court" — "Priceless." PRACTICES)

For the foregoing reasons, the Motions to Dismiss should be DENIED in their entirety

Dated January 17, 2013 at Norwalk, Connecticut

Respectfully submitted,

MARC T. MILLER, ESQ. (Ct28743)
MARK STERN, ESQ. (Ct01701)
Mark Stern & Associates, LLC
PO BOX 2129
16 River Street
Norwalk CT 06852-2129
(203) 853-2222
mtm@msternlaw.com

CERTIFICATE OF SERVICE

The undersigned certifies that on January 17, 2013, a copy of the foregoing was filed electronically and served by mail on any party unable to accept electronic filing and notice. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail as indicated on the CM/ECF Notice of Electronic filing.  Parties may access this filing through the Court's CM/ECF System.


Jeffrey M. Knickerbocker    - by ECF

David M. Bizar              - by ECF


Marc T. Miller, Esq.
Attorney for Plaintiff