UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES DAVIS,<br>　　　*Plaintiff*,<br>　　　　*v.*<br>HUNT LEIBERT JACOBSON P.C. and<br>WELLS FARGO BANK N.A.,<br>　　　*Defendants*. | Civil No. 3:12cv1102 (JBA)<br><br><br>May 20, 2016 |

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**[Doc. ## 106, 108] & MOTIONS TO DISMISS [Doc. ## 142, 144]**

Plaintiff James Davis, an active duty service member in the U.S. Navy, filed this suit against the law firm Hunt Leibert Jacobson, P.C. ("Hunt Leibert") and Wells Fargo Bank, N.A. ("Wells Fargo") for claims arising from home foreclosure proceedings they initiated against him. Defendants now move [Doc. ## 106, 108] for summary judgment on Plaintiff's claims[1] of violations of the Servicemembers Civil Relief Act ("SCRA") (Count One); the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Two); the Connecticut Creditors' Collection Practices Act ("CCPA") (Count Three); Negligent Infliction of Emotional Distress ("NIED") (Count Five); and Breach of the Covenant of Good Faith and Fair Dealing (Count Six) (Wells Fargo only). Following oral argument on these motions, Defendants further moved [Doc. ## 142, 144] to dismiss Mr. Davis's SCRA claim on the grounds that the Court lacks subject-matter jurisdiction. For the following reasons, Defendants motions to dismiss Count one are granted; Hunt Leibert's motion for summary

---

[1] Count Four alleging Fair Debt Collection Practices Act violation was earlier dismissed as time barred.  (Ruling on Motion to Dismiss [Doc. # 44].)

judgment is granted on all counts; and Wells Fargo's motion for summary judgment is granted as to Counts Six and Three and denied as to Counts Two and Five.

## I.      Background

In April 2006, Mr. Davis, an active duty service member in the U.S. Navy, purchased a home for his family at 3 Exley Road in Plainfield, Connecticut (Davis Dep., Ex. 1 to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 106-21] at 10–11), executing and delivering a Note in the original principal amount of $268,552.00 to CTX Mortgage Company, LLC., which subsequently assigned the Note and mortgage to Wells Fargo (Neely Aff., Ex. 5 to Defs.' Loc. R. 56(a)1 Stmt. ¶ 3).

Plaintiff stopped making regular payments on the Note prior to November 5, 2007, resulting in several notifications from Wells Fargo that his "loan [wa]s in default" and that "[u]nless the payments on [his] loan can be brought current" it would "become necessary to accelerate [his] Mortgage Note and pursue the remedies provided for in [his] Mortgage or Deed of Trust." (November 5, 2007 Ltr., Ex. 6 to Defs.' Loc. R. 56(a)1 Stmt. at 116; January 7, 2008 Ltr., Ex. 7 to Defs.' Loc. R. 56(a)1 Stmt. at 119; April 6, 2008 Ltr., Ex. 8 to Defs.' Loc. R. 56(a)1 Stmt. at 122; June 8 Ltr., Ex. 9 to Defs.' Loc. R. 56(a)1 Stmt. at 125.)

### A.   Loan Modification Agreement

On June 12, 2008, Mr. Davis entered into a Loan Modification Agreement ("Modification Agreement") with Wells Fargo with his first payment due September 1, 2008. (Modification Agreement, Ex. 10 to Defs.' Loc. R. 56(a)1 Stmt. at 128.) However, Plaintiff failed to make the requisite payment under the Agreement.[2] (Davis Dep. at 14–

---

[2] Mr. Davis acknowledges that he did not make direct payments to Wells Fargo. Instead, he claims he entered into an agreement with Kirkland Young, a company

16.) Thus, on October 5, 2008, Wells Fargo advised Plaintiff that he was in default on his loan (October 5, 2008 Ltr., Ex. 11 to Defs.' Loc. R. 56(a)1 Stmt. at 133), and referred the defaulted Note to Hunt Leibert (Neely Aff. ¶ 3), which commenced a foreclosure action in state court against Plaintiff on February 13, 2009 (*see* Marshal Proof of Service, Ex. 12 to Defs.' Loc. R. 56(a)1 Stmt. at 136–37). On February 19, 2009, Mr. Davis filed a *pro se* appearance in the foreclosure action (*see* Pro Se Appearance, Ex. 13 to Defs.' Loc. R. 56(a)1 Stmt. at 139), and filed an application to participate in a Foreclosure Mediation Program (Foreclosure Mediation Program App., Ex. 16 to Defs.' Loc. R. 56(a)1 Stmt. at 153), which was granted on March 5, 2009 (Case Details, Ex. 17 to Defs.' Loc. R. 56(a)1 Stmt. at 156). Plaintiff testified that he attended two or three mediation sessions. (Davis Dep. at 59–60.)

### B.  Temporary Forbearance Agreement

On August 31, 2009, Wells Fargo and Plaintiff entered into a Temporary Forbearance Agreement ("Forbearance Agreement") under which Plaintiff agreed to make payments of $1,896.03 on October 1, November 1, and December 1, 2009. (Forbearance Agreement, Ex. 18 to Defs.' Loc. R. 56(a)1 Stmt. at 159–60.)

Wells Fargo maintains that it entered into this agreement to determine if Mr. Davis qualified for a permanent loan modification and that Mr. Davis was aware of this objective

---

purporting to provide mortgage relief services, which directed him to put the funds that he would normally use for mortgage payments into something "like an escrow account" and assured him that it would use these payments to satisfy the terms of the Modified Agreement while attempting to negotiate a lower mortgage rate. (Davis Dep. at 15–19.) When Wells Fargo informed Plaintiff that it "did not have records of interactions with Kirkland Young," Mr. Davis testified that he then pulled his money out of the escrow account sometime around September 2009. (*Id.* at 20.)

from the September 2009 Foreclosure Mediation Report sent to him which stated that "Defendant [Davis] has received a 3 Month Trial Period offer for a workout. The last payment under the agreement is scheduled to be made on or before 11/1/09, after which the loan will be reviewed for a permanent loan modification." (Foreclosure Mediation Report, Ex. 19 to Defs.' Loc. R. 56(a)1 Stmt. at 162.) Mr. Davis claims that he believed any future payments would be $1,896.03 per month or less. (Davis. Dep. II, Ex. 1 (Vol. I) to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 117-2] at 124.)

In October 2009, Mr. Davis deployed overseas on a nuclear submarine and did not return to the United States until April 2010, believing that he had put his home mortgage affairs in order before his deployment. His wife made the required payments in October, November, and December but when she tried to make a fourth payment in January 2010, Wells Fargo refused to accept it. (Davis Dep. II (Vol. I) at 40−41.) Mr. Davis contacted Wells Fargo while he was in Spain on a temporary shore visit and was told that Defendant would "continue to discuss and negotiate with [his] wife, Kathy," and if the situation did not resolve, discussions would resume when Mr. Davis returned to the United States sometime in April or May 2010. (Davis Aff. To Pl.'s Opp'n to Defs.' Mots for Summ. J. [Doc. # 119-1] ¶ 24.)

On February 8, 2010, while Mr. Davis was still deployed, the foreclosure mediator issued a Final Report stating that because Mr. Davis had failed to attend mediation sessions scheduled June 22, 2009, September 03, 2009, November 18, 2009, and January 13, 2010, and had not requested any extension of time, "[t]he mediation period [wa]s now terminated." (Final R., Ex. 22 to Defs.' Loc. R. 56(a)1 Stmt. at 184.) The mediator also

checked the "Settled" box on the Final Report, under which she indicated that the case was to be withdrawn by June 7, 2010, a date on which Mr. Davis was not deployed. (*Id.*)[3]

On March 16, 2010, while Mr. Davis was deployed, Wells Fargo wrote to him that "after carefully reviewing the information [he provided], [it was] unable to adjust the terms of [his] mortgage" and that this decision "was made because [he] did not provide [Wells Fargo] with all of the information needed within the time frame required per [the] trial modification period workout plan." (March 16, 2010 Ltr., Ex. 23 to Defs.' Loc. R. 56(a)1 Stmt. at 186.) However, Plaintiff states that he was unaware that the August 2009 Temporary Forbearance Agreement contained any documentation requirement and that at no point after this agreement was executed did Wells Fargo make requests for financial information, nor advise Mr. Davis that "more information was needed if [Defendant was] going to continue to honor [the agreement] to stay the foreclosure (Davis Aff. ¶ 22). Defendants offer nothing to reflect that Wells Fargo's requested additional information at any point prior to March 16, 2010, and the Forbearance Agreement is silent as to any such requirements. (*See* Forbearance Agreement at 159–60)

When Mr. Davis returned from deployment in April 2010, he sent Wells Fargo a hardship letter, financial worksheet, and proof of salary, prompting Wells Fargo to offer a Stipulated Partial Reinstatement/Repayment Agreement, which required Mr. Davis to pay $10,000 upfront and $3,030 a month over the course of a year. (*See* Repayment Agreement, Ex. 25 to Defs.' Loc. R. 56(a)1 Stmt. at 196–97.) Mr. Davis could not afford Wells Fargo's

---

[3] The parties dispute whether checking this box was in error.

offer, but expected to receive another offer, which Wells Fargo never made. (Davis Dep. at 27.)

### C.  Dismissal of Action and Strict Foreclosure

On June 7, 2010, after Mr. Davis's deployment had concluded, the foreclosure action was dismissed (Case Details at 156), although Mr. Davis did not know of this disposition and was "still in fear of losing the house."[4] Mr. Davis recalls several conversations he had with Wells Fargo during the June-August 2010 time period, which made him believe that they "were progressing towards some end that [Plaintiff would] somehow be able to keep [his] home." (Davis. Dep. III at 37–38.)

On June 17, 2010, five days before Mr. Davis was underway and after the foreclosure action was dismissed, Defendants inexplicably moved for summary judgment on the already-closed foreclosure action (2010 Mot. Summ. J., Ex. 28 to Defs.' Loc. R. 56(a)1 Stmt.), sending a copy of the motion to Mr. Davis, which Plaintiff claims he never received. The next day, Defendants, presumably realizing the procedural posture of the case, filed a Motion to Reopen and Set Aside Judgment of Dismissal, again sending a copy to Mr. Davis (Mot. Reopen, Ex. 26 to Defs.' Loc. R. 56(a)1 Stmt. at 205), which Plaintiff again states that he never received (Davis Dep. III at 38–39).  Although when the state court held a hearing

---

[4] Mr. Davis was "underway" June 22, 1010 to June 24, 2010; July 4, 2010 to July 12, 2010; August 6, 2010 to August 13, 2010; August 16, 2010 to August 23, 2010; August 30, 2010 to September 1, 2010. (Pl.'s Suppl. Resp. to Interrog., Ex. A. to Defs.' Reply [Doc. # 127-1] at 7.) He explained that being "underway" meant that his "submarine was at sea from its home port of New London for periods of time" and that he was "required to be on the boat 1 day before and 1 day after such exercises" and "reported to the boat and slept on the boat on a regular basis during these times." (Id.)

on this motion on June 28, 2010, at which Ms. Davis appeared and advised the judge and Bruce Fair, Wells Fargo's attorney, that her "husband was at sea and unavailable." (Kathy Davis Aff., Loc. R. Pl.'s 56(a)2 Stmt. at ¶ 14.) The judge informed the parties that he would grant the motion to reopen and stated that "as soon as [Mr. Davis] gets back, [the case would] have to [be] put back into mediation," while directing Attorney Fair to give Ms. Davis his information so that she could contact him directly. (Transcript of Proceeding, Ex. 6 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 118-7] at 3–4; Order Granting Mot. Reopen, Ex. 27 to Defs.' Loc. R. 56(a)1 Stmt. at 207.) However, the case was never returned to foreclosure mediation.

On July 13, 2010, a day after Mr. Davis returned from being underway, Defendants filed a Motion for Strict Foreclosure and Finding of Entitlement to Possession (Mot. Strict Foreclosure, Ex. 31 to Defs.' Loc. R. 56(a)1 Stmt. at 275–78). Mr. Davis, who claims not to have received this motion either (Davis Dep. III, Ex. 2 to Pl.'s Loc. R. 56(a)2 Stmt. at 39), failed to oppose. The state court granted the motion on July 26, 2010, and set the first law day for September 13, 2010. (Order on Mot. Strict Foreclosure, Ex. 32 to Defs.' Loc. R. 56(a)1 Stmt. at 280.)

### D.  The August 2010 Vacate Letter

Sometime in early-to-mid August 2010, after returning from being underway, Mr. Davis received a letter informing him that his family needed to be "off the premises" or they would be "forcibly removed" on or about September 12th [the day before the first law day] and that "the motion for foreclosure ha[d] moved forward." (Davis Dep. at 29–32.) At the time Mr. Davis received this letter, he still believed that he owned the property and was hopeful that he would be able to keep it. (Davis Dep. II (Vol. II), Ex. 1 to Pl.'s Loc. R. 56(a)2

at 55–57.) After receiving the letter, he and his wife "sat in the driveway and kind of cried over it" and then shared it with two of their children and their son's girlfriend, and later, discussed it with a Wells Fargo employee. (Davis Dep. at 29, 34; Davis Dep. II (Vol. I) at 253.)

Mr. Davis "didn't know who sent the letter" and stated that "the only way we're ever going to know is, it seems like, is to lay eyes on said document." (Davis Dep. II (Vol. I) at 253.) However, he has never produced the letter and believes that it may have gotten lost in the hurried move to Kittery, Maine, where the Davis family relocated after vacating 3 Exley Road as demanded by the letter. Mr. Davis alleged that because Wells Fargo typically sent correspondence by "normal mail" and Hunt Leibert hand-delivered its correspondence,[5] he believed it more likely that Hunt Leibert sent the letter because his son told him that it had been "dropped off" or "left at the door" and not placed in the mailbox. (Davis Dep. at 30–31.)

Hunt Leibert declares that it never sent Mr. Davis any such letter, relying on an absence in its file of a referral by Wells Fargo to initiate eviction proceedings and its general business practice to never send an eviction letter in a foreclosure case without first having obtained "an ejectment order in the foreclosure case or a proper eviction order from the housing court." (Staskiewicz Aff., Ex. 14 to Defs.' Loc. R. 56(a)1 Stmt. ¶¶ 4–6.) Wells Fargo also denies sending any such letter to Plaintiff, pointing to the absence of any record in its

---

[5] The Certification pages attached to several of Hunt Leibert's filings indicate that the documents were "mailed" to Mr. Davis. (Mot. Reopen at 205; Mot. Summ. J. at 229)

file. After the Davis family vacated the home, Wells Fargo assumed maintenance of the property.

### E. Vacating Judgment of Strict Foreclosure

On September 14, 2010, Hunt Leibert filed a Motion to Open and Extend the Law Day until November 15, 2010 "for the purpose of allowing [it] additional time to comply with the Veteran's Administration's internal requirements, including obtaining Veteran's Administration bids." (Hunt Leibert Mot. Open & Extend Law Day, Ex. 33 to Defs.' Loc. R. 56(a)1 Stmt. at 282.) It sent a copy to Mr. Davis at 3 Exley Road (*id.* at 283), but Mr. Davis, who had moved to Maine by that time, denies having received it (Davis Dep. III at 39–40).

On November 15, 2010, Hunt Leibert filed a Motion to Open and Vacate the Judgment of Strict Foreclosure representing that Mr. Davis was "currently active in the United States military service" and requesting "additional time to review the file to ensure that the foreclosure complied with its internal requirements." (Mot. Vacate J., Ex. 35 to Defs.' Loc. R. 56(a)1 Stmt. at 287.) The motion was granted and the foreclosure action was dismissed on January 18, 2011 (Case Details at 157.)

After Mr. Davis learned of this dismissal, he travelled to Connecticut to examine and inspect the home and found it vandalized, damaged, and unfit for occupancy. He then commenced this action against Hunt Leibert and Wells Fargo on July 31, 2012.

## II.      Discussion

### A. Defendants' Motions to Dismiss Plaintiff's SCRA claim (Count One)[6]

Because the Court must dismiss an action if it determines "at any time that it lacks subject-matter jurisdiction," Fed R. Civ. P. 12(h)(3) (emphasis added), the Court will begin by addressing Defendants' recent, albeit belated, jurisdictional motions in which they maintain that this Court lacks subject-matter jurisdiction because the SCRA, as it existed in July 2010 when the conduct relevant to Plaintiff's SCRA occurred, did not provide an express or implied private right of action for damages, and the 2010 amendment[7] which added an express private right of action, effective October 2010, does not apply retroactively.

---

[6] Hunt Leibert "joins in and adopts the briefing and arguments of Wells Fargo['s]" memorandum in support of its motion to dismiss and reply. (Hunt Leibert Mot. to Dismiss at 1; *see* Hunt Leibert Reply [Doc. # 158].)

[7] Section 50 U.S.C. § 4042 (formerly "Section 597a") provides that:

(a) In general

Any person aggrieved by a violation of this chapter may in a civil action–

(1) obtain any appropriate equitable or declaratory relief with respect to the violation; and

(2) recover all other appropriate relief, including monetary damages.

(b) Costs and attorney fees

The court may award to a person aggrieved by a violation of this chapter who prevails in an action brought under subsection (a) the costs of the action, including a reasonable attorney fee.

Amended in 2003, the SCRA "restated and strengthened" the Soldiers' and Sailors' Civil Relief Act ("SSCRA"),[8] and is liberally construed to effectuate its purpose of "prevent[ing] default judgments from being entered against members of the armed services in circumstances where they might be unable to appear and defend themselves." *United States v. Kaufman*, 453 F.2d 306, 309 (2d Cir. 1971); *see In re Templehoff*, 339 B.R. 49, 53 (S.D.N.Y. 2005). Section 3931(a)[9] of the SCRA ("Protection of servicemembers against default judgments") applies "to any civil action or proceeding . . . in which the defendant [active duty servicemember] does not make an appearance." Under this provision—the only provision of the SCRA at issue in this case—"the court, before entering judgment for the plaintiff, shall require the plaintiff to file with the court an affidavit" stating whether or not the defendant is in military service.  50 U.S.C. § 3931(b)(1). If the defendant is in military service, "the court may not enter a judgment until after the court appoints an attorney to represent the defendant," *id.* § 3931(b)(2), and can stay the proceedings until the defendant-servicemember is located, *id.* § 3931(d). If default judgment is entered against a servicemember on military service, "the court entering the judgment shall, upon application by or on behalf of the servicemember, reopen the judgment for the purpose of allowing the servicemember to defend the action" so long as the servicemember was "materially affected by reason of that military service in making a defense to the action" and "has a meritorious or legal defense to the action or some part of it."  *Id.* § 3931(g).

---

[8] The SCRA and SSCRA are essentially identical: the provisions remained the same after the 2003 enactment, although some definitions were "reorganized." *See Cronin v. United States*, 98 Fed. Cl. 268, 270 n.2 (2011).

[9] Formerly § 521(a).

Defendants contend that this Court lacks subject-matter jurisdiction with respect to Plaintiff's SCRA claim because (1) § 4042 does not apply retroactively, and (2) § 3931(b) contains no implied private right of action for damages.

### 1.   Does § 4042 Apply Retroactively?

Under the framework established in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), determining whether the normal presumption against retroactivity applies in a particular case requires courts to first determine whether "Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If Congress has not, then courts decide whether applying the statute retroactively would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If the answer is yes, the presumption against retroactivity applies "absent clear congressional intent" that the statute should apply retroactively. *Id.*

It is undisputed that § 4042 is silent with respect to retroactivity. *See Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 459 (4th Cir. 2011). The parties' dispute focuses instead on the second step of the *Landgraf* retroactivity analysis,[10] i.e., whether retroactive

---

[10] Plaintiff additionally argues that § 4042 need not be applied retroactively in this case as Defendants engaged in a continuing course of unlawful conduct that extended well beyond § 4042 enactment  on October 13, 2010. While Plaintiff's allegations implicate conduct occurring after October 13, 2010, the conduct that forms the basis of Plaintiff's SCRA claim concerns Defendants motion for strict foreclosure on July 13, 2010. For that reason, the Court is unpersuaded by Plaintiff's "ongoing course of wrongful conduct" theory.

application of § 4042 "to the person objecting would have a retroactive consequence in the disfavored sense." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).

Three courts have addressed the retroactive application of § 4042, although in relation to sections of the SCRA not at issue here. In *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, the Fourth Circuit concluded that retroactive application of § 4042 with respect to § 3958[11] would not "impair the parties' rights or impose new duties," because prior to the adoption of § 4042, the SCRA's right of non-foreclosure was already enforceable in a Virginia conversion action in which the plaintiff could obtain compensatory and punitive damages.[12] *Gordon*, 637 F.3d at 460. Therefore, retroactive application of the SCRA's new monetary damages provision would not increase the defendant's liability exposure. Indeed, the Fourth Circuit concluded that the only additional effect of applying § 4042 retroactively was to provide a federal forum, and statutes that "only addresse[d] which court shall have jurisdiction" overcame the presumption against retroactivity. *Gordon*, 637 F.3d at 461 (stating that because "jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties," they could be applied retroactively (internal

---

[11] This section (formerly § 537) provides that "[a] person holding a lien on the property or effects of a servicemember may not, during any period of military service of the servicemember and for 90 days thereafter, foreclose or enforce any lien on such property or effects without a court order granted before foreclosure or enforcement." *Gordon*, 637 F.3d at 457.

[12] The lower court dismissed the plaintiff's SCRA claim that the defendant towing company had towed and sold his SUV while he was deployed on the grounds that it lacked subject-matter jurisdiction because the SCRA did not provide a private cause of action for damages. While appeal of this dismissal was pending, Congress enacted § 4042, additionally placing before the Fourth Circuit whether this newly adopted express right of action could be applied retroactively to this defendant.

quotation marks omitted)); *see Landgraf*, 511 U.S. at 274 ("Application of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case" and therefore can be applied without raising concerns of retroactivity.").

Applying *Gordon*'s reasoning, the Central District of California held that § 4042 does not apply retroactively with respect to § 3931(c)[13] where state law did not provide a cause of action for the plaintiff to obtain civil damages for the conduct complained of.[14] *Williams v. U.S. Bank Nat. Assoc.*, No. ED CV12-00748-JLQ, 2013 WL 571844, *4 (C.D. Cal. Feb. 13, 2013). Likewise, in *Giri v. HSBC Bank USA*, 98 F. Supp. 3d 1147 (D. Nev. 2015), the district court concluded that § 4042 did not apply retroactively to permit the plaintiff to sue for violations of § 3953(c) (formerly § 533(c)), which "voids foreclosures against property where the debt secured by the mortgage was incurred before the period of military service, the foreclosure is made during the military service or within one year thereafter, and where the foreclosure is not judicially ordered." *Id.* at 1151. Although Nevada already provided for "civil liability for entities wrongfully foreclosing on residential property," the court held that retroactive application of § 4042 would broaden these liabilities thus creating new legal consequences. *Id.* at 1152–53.

---

[13] Formerly §521(c), which provides that "[a] person who makes or uses an affidavit permitted under subsection (b) (or a statement, declaration, verification, or certificate as authorized under subsection (b)(4)) knowing it to be false, shall be fined as provided in Title 18 or imprisoned for not more than one year, or both."

[14] The court held that such conduct was not actionable under state law at the time it occurred due to the absolute litigation privilege.

Here, Defendants contend that retroactive application of § 4042 would extend their potential liability under then-existing law by permitting an otherwise unavailable damages remedy. Unlike in *Gordon* where state law already offered an avenue for the same monetary damages in relation to the conduct alleged, in this case, Defendants assert that "no federal or Connecticut state law in existence at the time the judgment was entered for Wells Fargo provided to a private litigant such as Plaintiff a cause of action for damages for *judicial* conduct involving affidavits not filed in court cases involving non-appearing defendant servicemembers," as the litigation privilege would bar such a claim. (Wells Fargo's Mem. Supp. Mot. Summ. J. [Doc. # 106] at 8–9.) In rebuttal, Plaintiff maintains that CUTPA already provided the same measure of damages for Defendants' wrongful conduct and no new legal consequences would impact the Defendants from retroactive application of § 4042.[15]

Unlike Plaintiff's CUTPA claim, his SCRA claim only implicates litigation conduct, which is not actionable under CUTPA due to both the litigation privilege and to "public policy consideration[s]" that limit CUTPA's scope to the "entrepreneurial or commercial aspects of the profession of law," neither of which are at issue here. *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 35 (1997). Were the Court to apply § 4042 retroactively, therefore, it would make actionable conduct that was protected by the absolute immunity

---

[15] Plaintiff misconstrues the Ruling [Doc. # 44] on Defendants' motions to dismiss. It did not, as Plaintiff claims, determine that the alleged wrongful actions that supported its CUTPA claim likewise supported its SCRA claim. Rather, the Court held that while "conduct . . . not in furtherance of litigation . . . [wa]s not protected by the litigation privilege," because Plaintiff had alleged conduct outside the litigation context, absolute immunity did not apply. (Ruling Defs.' Mot. Dismiss at 11–12.)

doctrine and not actionable at the time that it occurred, enabling Mr. Davis to seek monetary damages in relation to a section of a statute that is wholly concerned with affidavit requirements and judicial stays, thus imposing on Defendants "a new disability in respect to past conduct." *Landgraf*, 511 U.S. at 283. For these reasons, the Court concludes that retroactive application of § 4042 in this case would have an impermissible retroactive effect within the meaning of *Landgraf*, leaving Plaintiff with no express right of action under § 3931(b).

### 2. Does § 521(b) Contain an Implied Right of Action for Damages"?

Having concluded that § 4042 does not apply retroactively here, Defendants next contend that § 3931(b) also contains no implied right of action. They argue that unlike other sections of the SCRA in which courts have found implied rights of action, the provision at issue in this case is chiefly concerned with regulating judicial and litigation activity and does not impose individual obligations nor focus on the individuals protected. *See Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001) (stating that statutes that "focus[] neither on the individuals protected nor even on the [entity] being regulated, but on the agencies that will do the regulating" create "no implication of an intent to confer rights on a particular class of persons."). Plaintiff, for his part, maintains that the SCRA's legislative history and the case law interpreting the statute support a finding of an implied private right of action.[16]

---

[16] Plaintiff additionally insists that *Sandoval* does not control here, pointing to two cases in which courts found *Sandoval* to be inapposite. However, both cases involved the Trust Indenture Act, and the courts' decision not to use the *Sandoval* framework was underscored by the statute's focus on fiduciary duties, which "implied corresponding rights

16

In *Sandoval*, the Supreme Court circumscribed the scope of courts' authority to recognize implied rights of action, noting that "private rights of action to enforce federal law must be created by Congress" and the statute in question must evidence congressional intent to create a private right of action. *Id.* at 286. Absent such intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87. Thus, the Supreme Court instructed, "[i]n determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." *Id.* at 288 (internal citation omitted).

While several federal district courts have recognized an implied right of action in relation to various other sections of the SCRA,[17] none utilized the framework established

_____

in the beneficiaries," such that the distinction between statutes that focused on the persons regulated rather than the individuals protected was inapplicable. *See Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n*, No. 14-CV-9401 (KBF), 2016 WL 796848, at \*19 (S.D.N.Y. Feb. 26, 2016); *Fixed Income Shares: £Series M v. Citibank N.A.*, 130 F. Supp. 3d 842 (S.D.N.Y. 2015).

[17] *See Frazier v. HSBC Mortg. Servs., Inc.*, No. 8:08–CV–02396–T–24, 2009 WL 4015574, at \*4–5 (M. D. Fla. Nov. 19, 2009) (finding implied private right of action under § 3937 (formerly § 527)); *Hurley v. Deutsche Bank Trust Co.*, No. 1:08–CV–361, 2009 WL 701006, at \*4 (W. D. Mich. Mar. 13, 2009) (finding implied private right of action under §§ 3937, 3951 (formerly § 531), 3953 (formerly § 533(c))); *Linscott v. Vector Aerospace*, No. CV–05–682–(HU), 2006 WL 240529, at \*5–7 (D. Or. Jan. 31, 2006) (finding implied private right of action under § 3958 (formerly § 537)); *Cathey v. First Republic Bank*, No. 00–2001–M, 2001 WL 36260354, at \*6–7 (W. D. La. July 6, 2001) (finding implied private right of action under §§ 3919 (formerly § 518), 3936 (formerly § 526)); *Martin v. Armstrong*, No. 3:97–CV–2784–D, 1998 WL 1765716, at \*3 (N. D. Tex. Sept. 21, 1998) (finding implied private right of action under §§ 3919, 3936); *Moll v. Ford Consumer Fin. Co.*, No. 97 C 5044, 1998 WL 142411, at \*2–5 (N.D. Ill. Mar. 23, 1998) (finding implied private right of action under § 3937).

in *Sandoval*, relying instead on the four-factor test developed in *Cort v. Ash*, 422 U.S. 66 (1975).[18] In each of these cases, the courts identified an implied right of action because (1) servicemembers were "member[s] of the class for whose benefit the statute was enacted," (2) "an implied remedy was consistent with the underlying purpose of the statute," and (3) the cause of action was not "traditionally relegated to state law" because the SCRA was "grounded in Congress' right to raise and maintain armed forces of the United States." *Moll*, 1998 WL 142411, at *4; *see Hurley*, 2009 WL 701006, at *4. With respect to provisions regulating the interest rates that creditors could charge servicemembers or rights created under the SCRA and not "enjoyed by other citizens," *Moll*, 1998 WL 142411, at *4, courts

---

[18] In *Cort v. Ash*, the Supreme Court developed the following framework for determining whether a private right of action could be implied: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted, (2) whether there is any indication that Congress intended to create or deny such a remedy, (3) whether an implied remedy is consistent with the underlying purpose(s) of the statute, and (4) whether the cause of action is one traditionally relegated to state law. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002). Since *Sandoval*, the Second Circuit has expressed doubt as to the applicability of the *Cort v. Ash* factors. *See Hallwood*, 286 F.3d at 619 (recognizing that after *Cort v. Ash*, the Supreme Court "focused the analysis on the single question of whether congressional intent to create a private cause of action can be found in the relevant statute"); *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 434 (2d Cir. 2002) (noting that recent Supreme Court decisions have "subordinat[ed] the *Cort v. Ash* factors] to statutory text"). Because *Sandoval* did not expressly overrule *Cort*, however, some courts have continued to apply its four-factor framework to analyzing congressional intent. *See Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 53 (2d Cir. 2009); *see also Hallwood*, 286 F.3d at 619 ("As this circuit has explained, the remaining *Cort* factors (other than congressional intent) now enter into the analysis only as possible indicia for legislative intent.").

reasoned that without implied rights of action, such provisions could simply be ignored which was a result Congress could not have intended, *see Martin*, 1998 WL 1765716, at *3; *Moll*, 1998 WL 142411, at *4.

Defendants argue that these cases are distinguishable in that each addressed provisions of the SCRA that regulated "creditors"[19] or "landlords"[20] or "lienholders,"[21] while § 3931 (b) focuses exclusively on courts, or a regulating entity. Section § 3931(b)(1) provides that "[i]n any action or proceeding covered by this section, *the court*, before entering judgment for the plaintiff, shall require the plaintiff to file with the court an affidavit." Moreover, if "in an action covered by this section it appears that the defendant is in military service, *the court* may not enter a judgment until after *the court* appoints an attorney to represent the defendant." § 3931(b)(2) (emphasis added).

---

[19] *See Moll*, 1998 WL 142411, at *3–*4 (analyzing § 3936, which provides that "upon receipt of written notice and a copy of orders calling a servicemember to military service, *the creditor* shall treat the debt in accordance with [the section governing interest rate limitations]." (emphasis added)).

[20] *Hurley*, 2009 WL 701006, at *3 (analyzing § 3953 (formerly 533(c)), which states that "[a] sale, foreclosure, or seizure of property for a breach of [an obligation on real property owned by a servicemember that is secured by a mortgage] shall not be valid if made during, or within 90 days after, the period of the servicemember's military service except-(1) upon a court order granted before such sale . . . .]", and § 3951 (formerly § 531), which provides that "[e]xcept by court order, a landlord (or another person with paramount title) may not-(A) evict a servicemember [. . . .]."

[21] *Linscott*, 2006 WL 240529, at *7 (analyzing § 3958(a)(2), which states that "[n]o person shall exercise any right to foreclose or enforce any lien for storage of household goods, furniture, or personal effects of a person in military service during such person's period of military service and for three months thereafter.")

Although undeniably aimed at protecting servicemembers, the language of this provision focuses exclusively on the court requiring a plaintiff to file an affidavit informing it of a defendant's military status. This statutory language does not constitute an indication that Congress intended § 3931(b) to contain a private right of action for damages for failure to follow such procedures. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 170–71 (2d Cir. 2014) (holding that under *Sandoval*, there was no evidence of congressional intent of a private right of action because "[t]he statute's prohibitions focus on the regulated entities; the FCPA contains no language expressing solicitude for those who might be victimized by acts of bribery, or for any particular class of persons"). Indeed, § 3931(b) is similar to the regulation at issue in *Sandoval*, which, in authorizing federal agencies to "effectuate provisions of [Title VI] . . . by issuing rules, regulations, or orders of general applicability," was seen to be "twice removed from the individuals who w[ould] ultimately benefit from Title VI's protection" such that there was no basis "to infer a private remedy in favor of individual persons." *Sandoval*, 532 U.S. at 285–89 (internal quotation marks omitted). Nor would the rights under this section be rendered "illusory" without an implied right of action, as the provision regulates conduct occurring in the context of a judicial proceeding and is wholly concerned with monitoring the enforcement of such rights. *See Hurley*, 2009 WL 701006, at *4. Therefore, applying the standards established in *Sandoval*, the Court concludes that § 3931(b) contains no implied right of action and thus Defendants' motions to dismiss Plaintiff's SCRA claim are granted.

**B.  Defendants' Motions for Summary Judgment**[22]

Defendants move for summary judgment on Plaintiff's claims of violation of CUTPA (Count Two); the CCCPA (Count Three); NIED (Count Five); and Breach of the Covenant of Good Faith and Fair Dealing (Count Six) (as to Wells Fargo only).[23] For the following reasons, Hunt Leibert's motion is granted on all counts and Wells Fargo's motion is granted as to Count Six.

**1.  Connecticut Unfair Trade Practices Act (Count Two)**

Defendants contend that their motions for summary judgment on Plaintiff's CUTPA claim[24] should be granted because (1) the claim is barred by the doctrine of

---

[22] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

[23] Wells Fargo "joins in, adopts, and incorporates herein by reference the arguments and authorities of Hunt Leibert's Motion for Summary Judgment." (Wells Fargo Mem. Supp. at 9.)

[24] There are three criteria for determining whether an act or practice is "unfair" within the meaning of CUTPA:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by

21

absolute immunity, and (2) the conduct about which Plaintiff complains does not implicate the entrepreneurial or commercial aspects of Hunt Leibert's practice and thus falls outside of CUTPA. Plaintiff responds that because his CUTPA claim pertains to Defendants' alleged wrongful debt collection activity—wholly apart from their conduct in the foreclosure proceedings—the litigation privilege does not bar this claim and summary judgment should be denied.

Clearly, "'the noncommercial aspects of lawyering—that is, the representation of a client in a legal capacity—should be excluded from liability under the CUTPA for public policy reasons.'" *Gabriele v. Am. Home Mortgage Servicing, Inc.*, 503 F. App'x 89, 96 (2d Cir. 2012) (quoting *Haynes*, 243 Conn. 17)). Relatedly, courts have upheld application of the litigation privilege to CUTPA claims.[25] This privilege is available to "all participants in

---

> statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors, or other businesspersons].

*Ventres v. Goodspeed Airport*, LLC, 275 Conn. 105, 154–55 (2005). A plaintiff need not satisfy all three requisites to support a finding of unfairness; rather, "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

[25] *See Dina v. Cuda & Associates*, 950 F. Supp. 2d 396, 407 (D. Conn. 2013); *Jonas v. Delallo*, No. CV105029297S, 2012 WL 6846396, at *10 (Conn. Super. Ct. Dec. 11, 2012) (finding the doctrine of absolute immunity applicable to plaintiff's CUTPA claim due to "the strong public policy of encouraging participation and candor in judicial and quasi-judicial proceedings, and the strong public policy that seeks to ensure that attorneys provide full and robust representation to their clients and that they provide such clients with their unrestricted and undivided loyalty" (internal quotation marks omitted)); *SNET Info. Servs. v. Vecchitto*, No. CV054016132, 2007 WL 4212699, at *3 (Conn. Super. Ct. Nov.

judicial proceedings, including judges, attorneys, parties, and witnesses," *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 627 (2013), and covers statements and pleadings in judicial proceedings.[26] In *Rioux v. Barry*, 283 Conn. 338 (2007) the Connecticut Supreme Court explained that the underlying purpose in granting absolute immunity to "those who provide information in connection with judicial and quasi-judicial proceedings" is to protect and ensure "participation and candor" in such proceedings. *Id.* at 344.

While Plaintiff does not dispute that the litigation privilege applies to CUTPA claims premised on conduct in furtherance of litigation, he contends that his CUTPA claim is predicated on non-litigation conduct to which the privilege does not apply. The Court agrees, at least with respect to some of Mr. Davis's CUTPA claims.

Based on the summary judgment record, a reasonable jury could infer that Wells Fargo engaged in conduct in violation of CUTPA when it entered into a temporary forbearance or modification agreement with Mr. Davis to determine his eligibility to receive a permanent loan modification and then denied him any mortgage modification on the grounds that he "did not provide [it] with all of the information needed within the time frame" (March 16, 2010 Ltr., at 186), but had never requested such information from Plaintiff. Although Wells Fargo relies on the temporary forbearance agreement as evidence of its information request, nowhere in the document is there any indication that Mr. Davis needed to provide additional information or should anticipate being asked to do so. (*See*

---

6, 2007); *see also Pellechia v. OneWest Bank, FSB*, 3:11-CV-1587 (JCH), Ruling on Motion to Dismiss [Doc. # 91] at 18 (D. Conn. Aug. 24, 2012).

[26] *See Pellechia*, 3:11-CV-1587, at 18.

Forbearance Agreement at 159–60.) All the agreement required was that he make three payments in October, November, and December 2009, which he did. Moreover, Mr. Davis testified that when Wells Fargo subsequently refused to modify his mortgage, he spoke with Defendant about "what went wrong" and Wells Fargo claimed that Ms. Davis had defaulted on the January payment, but said nothing about any failure by Plaintiff to provide requested information. (Davis Dep. II (Vol. II) at 43–45.) Moreover, while it is undisputed that Ms. Davis did not make a January payment, she claims this is because Wells Fargo refused to take it, telling her that it "w[as] not exercising the option to allow [Mr. Davis] to continue the mortgage." (*Id.*) The Court concludes, therefore, that triable disputes of material fact exist with respect to whether Wells Fargo's conduct violated CUTPA when it (1) denied Mr. Davis's loan modification without notice to Plaintiff on a pretextual basis, and (2) refused to accept any attempted mortgage payments from Plaintiff.

Likewise, the summary judgment record raises a triable dispute as to Mr. Davis's claim that Wells Fargo "fraudulently induced Plaintiff's family to vacate and abandon the[ir] Home," and then failed "to properly secure" the home after it had been vacated. (*See* Am. Compl. ¶ 59.) The record contains evidence from which reasonable jurors could conclude that Mr. Davis did, in fact, receive a letter or communication which prompted him and his family to immediately vacate their home. Even though the record lacks such a letter, Mr. Davis averred that he showed the eviction-type letter to several family members and spoke with Wells Fargo about it. Although Plaintiff himself testified that he "didn't know who sent the [August 2010] letter" that caused the family to leave (Davis Dep. II (Vol. I) at 253), a reasonable jury could conclude that the letter came from Defendants since they were the only entities prosecuting the foreclosure proceedings against Plaintiff's home and

24

they had obtained a court order for strict foreclosure less than three weeks before the date on which Mr. Davis claimed he received this letter. Based on these facts and construing all reasonable inferences in favor of the nonmoving party, the Court concludes that the record also raises a triable dispute as to whether Wells Fargo engaged in "harassing" tactics designed to "expedite the foreclosure" of Mr. Davis' home (Pl.'s Opp'n Wells Fargo Mot. Summ. J. [Doc. # 120] at 14) by sending an eviction-type letter notifying the family that they had "to have their stuff out by 'X' date" when they remained the lawful owners of the property. (Davis Dep. II (Vol. I) at 253.)

However, the Court concludes that this record does not support Plaintiff's CUTPA claim against Hunt Leibert. Even if the August 2010 letter had been sent by Hunt Leibert, there is no evidence to suggest that it would have contacted Mr. Davis in any capacity other than as Wells Fargo's counsel and at the direction of its client. To hold Hunt Leibert liable for actions that it took on behalf of its client and which do not implicate the entrepreneurial or commercial aspects of law would be impermissible under CUTPA for public policy reasons as it would directly interfere with the attorney-client relationship. *Suffield Dev. Associates Ltd. P'ship v. Nat'l Loan Inv'rs, L.P.*, 260 Conn. 766, 783–84, 802 (2002) ("Providing a private cause of action under CUTPA to a supposedly aggrieved party for the actions of his or her opponent's attorney would stand the attorney-client relationship on its head and would compromise an attorney's duty of undivided loyalty to his or her client and thwart the exercise of the attorney's independent professional judgment on his or her client's behalf." (quoting *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 727 (1993)); *Gabriele*, 503 F. App'x at 96.

Accordingly, Hunt Leibert's summary judgment motion on Plaintiff's CUTPA claim is granted, while Wells Fargo's summary judgment motion is denied.

### 2. Connecticut's Creditors' Collection Practices Act (Count Three)

Next, Defendants move for summary judgment on Plaintiff's CCPA claim on the grounds that (1) the CCPA is inapplicable because Defendant Hunt Leibert is not a "creditor" as defined by the statute, (2) the claim is time-barred since all of the alleged misconduct occurred more than one year before this action was commenced, and (3) Defendants are entitled to absolute immunity.[27]

### a. Is Hunt Leibert a "Creditor" as Defined by the Statute?

The Connecticut Creditors' Collection Practices Act, Conn. Gen. Stat. § 36a-646, prohibits a creditor from using "any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt." The term "creditor" is defined in relevant part as

> (A) any person to whom a debt is owed by a consumer debtor and such debt results from a transaction occurring in the ordinary course of such person's business, or (B) any person to whom such debt is assigned.

Conn. Gen. Stat. § 36a-645. Hunt Leibert contends that Mr. Davis's CCPA claim fails because there is no evidence that Plaintiff owed Hunt Leibert a debt or that any debt Plaintiff owed to Wells Fargo was assigned to Hunt Leibert. In response, Mr. Davis points to the Consumer Collection Agency Act ("CCAA") which states that "[a]ny person not

---

[27] Because, as discussed below, the Court finds merit in Defendants' first two arguments, it does not reach the third.

26

included in the definition [of consumer collection agency[28]] contained in this subdivision is, for purposes of sections 36a-645 . . . a 'creditor.'" Conn. Gen. Stat. § 36a-800(2). Plaintiff reasons that because this definition excludes "members of the bar," Hunt Leibert is a creditor by default.

However, the Connecticut Department of Banking has interpreted the "member of the bar" exception to apply only to attorneys and not to law firms, such that members of the Connecticut bar that collect debts are "creditors" (under the catchall provision in § 28a-800(1)), but the law firms for whom they work are "consumer collection agencies." *See* Decl. Ruling, Petition of Persels and Assocs., LLC at 9 n.9 (Conn. Dept. of Banking Sept. 11, 2012). This interpretation is supported by the statute's language which singles out individual members for exclusion rather than law firms. Because Mr. Davis alleged only violations of the CCPA, applicable to "creditors," and not the CCAA, applicable to "consumer collection agencies," i.e., Hunt Leibert, the Court concludes that the CCPA, by its terms, is inapplicable to Hunt Leibert and summary judgment is granted in its favor.[29]

### b. Is the CCPA claim time-barred?

Wells Fargo argues that Plaintiff's CCPA claim is time-barred under § 36a-648(d), which states that "[a]n action to enforce liability under [the CCPA] may be brought in any court of competent jurisdiction not later than one year after the date on which the violation

---

[28] Defined as "any person engaged in the business of collecting or receiving for payment for others of any account, bill or other indebtedness from a consumer debtor." Conn. Gen. Stat. § 36a-800(1)

[29] Even if Hunt Leibert were a "creditor," Plaintiff's CCPA claim would be time-barred under the same analysis applied to Wells Fargo.

occurs." Plaintiff does not respond to the merits of this claim, focusing instead on his contention that Wells Fargo waived this defense by failing to raise it in its Answer. However, Plaintiff's waiver argument fails because he has had the opportunity to respond to this defense so that the purpose of Federal Rule of Civil Procedure 8(c) has been served and the defense may be raised in a summary judgment motion.  (*See* Order Mot. to Amend [Doc. # 159].)

The last date on which Wells Fargo could have acted in connection with the foreclosure action was January 18, 2011, the date on which the foreclosure action at issue in this case was dismissed. Thus, any unlawful conduct necessarily occurred more than a year before Mr. Davis brought suit on July 31, 2012. Accordingly, Plaintiff's CCPA claim is time-barred and summary judgment is granted to Wells Fargo.

### 3.   Negligent Infliction of Emotional Distress (Count Five)

Defendants next seek summary judgment on Mr. Davis's NIED[30] claim, on the grounds that (1) the claim is barred by the doctrine of absolute immunity, (2) Plaintiff has failed to show that Defendants' conduct created an unreasonable risk of causing distress that might result in illness or bodily harm, and (3) permitting Plaintiff to bring an NIED

---

[30] To prove a claim of NIED, a plaintiff must show:

[T]he defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

*Carroll v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

claim against an adversary's counsel contravenes public policy. Plaintiff contends, however, that the conduct at issue "goes beyond the scope of statements taken during the [litigation process] and [is], accordingly, not the subject of the immunity privilege." (Pl.'s Opp'n Hunt Leibert Mot. Summ. J. at 18.) Specifically, Mr. Davis claims that the following actions by Defendants satisfy the elements of an NIED claim: (1) "reneg[ing] on the transaction  by refusing to accept the requisite monthly payments," (2) waiting until Plaintiff had deployed before "pounc[ing] on their opportunity [to] recommence the foreclosure proceeding and obtain[] a judgment of foreclosure by sale within a two month time period," (3) "forc[ing] Plaintiff's family from their home without any legal basis to do so, and exercis[ing] control over the property for several months following the passing of the foreclosure law date," and (4) failing to complete the title transfer, abandoning the property, and once again demanding that the Plaintiff pay his mortgage. (*Id.* at 20–21.)

The Court agrees that a reasonable jury could conclude that Wells Fargo's refusal to accept additional mortgage payments from Plaintiff after he had satisfied the terms of the forbearance agreement, coupled with its pretextual basis for denying Mr. Davis a permanent loan modification for failure to provide information never requested, after which Wells Fargo sent an eviction-type letter that forced the family to vacate its home when Defendant had no legal basis for evicting them, could support a finding that Wells Fargo's course of conduct created "an unreasonable risk of causing the plaintiff emotional distress" that was "foreseeable" and that the emotional distress was severe enough to result in harm and did in fact cause Mr. Davis harm.  For these reasons, Wells Fargo's motion is denied on this count.

However, notwithstanding Plaintiff's arguments to the contrary, Defendants' conduct in recommencing the foreclosure litigation proceedings cannot support Mr. Davis's NIED claim. Because the record contains no evidence outside of Hunt Leibert's representation of its client,[31] its motion is granted as to Count Five.

### 4.   Breach of the Covenant of Good Faith and Fair Dealing (Count Six)

---

[31] Despite Plaintiff's position to the contrary, allowing litigation-related conduct to form the basis of an NIED claim would implicate significant public policy concerns. *See Krawczyk v. Stingle*, 208 Conn. 239, 246 (1988) ("Determining when attorneys should be held liable to parties with whom they are not in privity is a question of public policy . . . . Courts have refrained from imposing liability when such liability had the potential of interfering with the ethical obligations owed by an attorney to his or her client." (internal citation and quotation marks omitted)). The Connecticut Appellate Court has concluded that an NIED claim premised on statements made in connection with judicial proceedings are protected by absolute immunity. *See Stone v. Pattis*, 144 Conn. App. 79, 99 (2013) ("We conclude, therefore, after reviewing the multitude of arguments the plaintiffs advance, that the allegations supporting their claim of negligent infliction of emotional distress [all of which pertain to litigation conduct] are based on communications protected by absolute immunity from suit" and therefore such claims should be dismissed); *see also Law Offices of Frank Peluso, P.C. v. Rendahl*, No. FSTCV115013762S, 2015 WL 3651824, at *2 (Conn. Super. Ct. May 15, 2015) ("[C]laims against attorneys for negligent infliction of emotional distress are barred when the alleged conduct giving rise to the action occurs in the course of judicial proceedings."); *Perugini v. Guiliano*, No. CV105016077, 2012 WL 3518047, at *3 (Conn. Super. Ct. July 26, 2012) ("The claim for negligent infliction of emotional distress, is, in this court's view, akin to a defamation claim for which absolute immunity remains a viable shield. There is nothing in the elements of the offense which would guard against the concerns for which absolute immunity is afforded in the first instance. . . . Litigation is by its nature stressful and is often emotionally charged. While a litigant has an interest in not being subject to the negligent infliction of emotional distress during that litigation, this interest is no greater than a litigant's interest in being free from defamation.").

Finally, Wells Fargo moves for summary judgment on Plaintiff's claim that it breached its obligation of good faith and fair dealing[32] on two grounds: (1) Mr. Davis has failed to produce any evidence of a modification agreement between parties, and (2) if any agreement existed orally between the parties, it is barred from enforcement by the statute of frauds. In response, Mr. Davis claims that he does not "seek to bring an action to enforce the modification/forbearance agreement but, rather, to recover damages incurred by the Plaintiff as a result of the Defendant's bad faith" in inducing Plaintiff to enter into an agreement to "stave off a foreclosure" and then reneging on it. (Pl.'s Opp'n Wells Fargo Mot. Summ. J. at 16–17.) He further contends that the statute of frauds is inapplicable as his claim amounts to a "defense theory" premised on the notion that Wells Fargo engaged in a "deceptive scheme . . . surrounding the modification agreement" and there is "no writing requirement for a claim based on [a] 'deceptive scheme.'" (*Id.* at 17.)

By contending that his breach of the covenant of good faith and fair dealing claim is premised not on any forbearance agreement—or indeed on any contract at all—but instead on Wells Fargo's alleged negligent misrepresentations to Mr. Davis about its desire

---

[32] An action for breach of the covenant of good faith and fair dealing requires proof of "three essential elements:"

> [F]irst, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith.

*Franco v. Yale Univ.*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002), *aff'd* 80 F. App'x 707 (2d Cir. 2003).

to modify his loan amounts, Plaintiff shifts the scope of his argument to a claim of fraudulent or negligent misrepresentation by Wells Fargo. (Pl.'s Opp.'n Wells Fargo Mot. Summ. J. at 18–19.) However, Plaintiff never plead the tort of negligent misrepresentation and no duty of good faith and fair dealing applies to tortious conduct. Therefore, summary judgment is granted in Wells Fargo's favor

### III. Conclusion

For the foregoing reasons, Defendants' motions to dismiss [Doc. ## 142, 144] Plaintiff's SCRA claim are GRANTED; Hunt Leibert's motion [Doc. # 106] for summary judgment is GRANTED on all counts; and Wells Fargo's motion [Doc. # 108] for summary judgment is DENIED as to Plaintiff's CUTPA (Count Two) and NIED (Count Five) claim, but GRANTED as to Plaintiff's claim of CCPA violation (Count Three) and Breach of the Covenant of Good Faith and Fair Dealing (Count Six). Hunt Leibert is dismissed from this case.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 20th day of May 2016.